# STATE OF MICHIGAN

# COURT OF APPEALS

LAWRENCE FINGERLE,

Plaintiff-Appellee,

v

CITY OF ANN ARBOR, a Michigan Municipal
Corporation,

Defendant-Appellant,

and

AMERICAN FIRE AND CASUALTY
COMPANY,

Defendant.

FOR PUBLICATION
December 2, 2014
9:10 a.m.

No. 310352
Washtenaw Circuit Court
LC No. 11-228-CZ

Before: BECKERING, P.J., and SAAD and O'CONNELL, JJ.

SAAD, J.

Defendant appeals the trial court's denial of its motion for summary disposition as to plaintiff's claim under MCL 691.1416–1419 (the "Sewage Act") of the Governmental Tort Liability Act (GTLA), MCL 691.1401, *et seq*.[1] For the reasons set forth in this opinion, we reverse and dismiss plaintiff's claim.

---

[1] Our Court reviews de novo both the applicability of governmental immunity and a trial court's decision on a motion for summary disposition under MCR 2.116(C)(7). *Roby v City of Mount Clemens*, 274 Mich App 26, 28; 731 NW2d 494 (2006). Motions for summary disposition pursuant to MCR 2.116(C)(7) are granted when a claim is barred by "immunity granted by law." The moving party may "support its motion for summary disposition under MCR 2.116(C)(7) with 'affidavits, depositions, admissions, or other documentary evidence,' the substance of which would be admissible at trial." *Odom v Wayne Co*, 482 Mich 459, 466; 760 NW2d 217 (2008), quoting *Maiden v Rozwood*, 461 Mich 109, 119; 597 NW2d 817 (1999). "The contents

-1-

I. ANALYSIS

Plaintiff's home is located in the Landsdowne subdivision in Ann Arbor. The neighborhood has historically been prone to flooding, and Ann Arbor, without any legal duty to do so, built drainage infrastructure to service the area the early 1990s.[2] Yet, despite the fact that Ann Arbor's infrastructure helped to reduce the amount of rain-caused flooding—a fact that plaintiff concedes[3]—flooding continued to occur during and after large rainstorms in the 1990s and 2000s. Plaintiff claims he was unaware of the risk of flooding during this time period. In 2002, he built a finished basement and a large egress window directly across from a private retention basin that had overflowed in past rain events. In June 2010, an intense rainstorm caused substantial flooding in the Landsdowne subdivision, and rainwater entered plaintiff's home through the egress window that faced the retention basin. Plaintiff's claim, reduced to its essence, is this: had Ann Arbor built its drainage infrastructure of the size it said it would,[4] the rain would not have flooded and damaged his basement.

Plaintiff's theory of recovery is deceptively simple, yet novel and problematic. If adopted by our Court, it would impose unlimited and unprecedented liability, and create the potential for financially crippling damage awards against cities—and ultimately, their tax-paying citizens—never seen in American or Michigan law.[5]

What makes plaintiff's radical claim even stranger is that it is brought against a government entity which the Michigan Legislature has protected with significant governmental immunity laws.[6] To further underscore the oddity of plaintiff's action, his specific claim is

of the complaint are accepted as true unless contradicted by documentation submitted by the movant." *Maiden*, 461 Mich at 119.

[2] In 1989, the city hired an engineering firm to investigate the water buildup in the neighborhood. According to the report and affidavit of plaintiff's expert witness, engineer Clif Seiber, the firm suggested construction of a relief storm sewer that could accommodate at least 3.25 inches of rainfall, the amount of water associated with a major, "10-year storm event."

[3] In his brief, plaintiff states that "*the Relief Sewer was able to handle only about one-fifth of the rainfall* generated by the June 2010 rain event . . ." (emphasis added).

[4] As noted, the city did not actually make any representation as to the size of the sewer—the private engineering firm it hired in 1989 made the representations about the sewer's capacity and size. Plaintiff bases his entire suit on the representation made by the private engineering firm.

[5] To our knowledge, American law has never imposed a duty or obligation on governmental entities to protect private property owners from extreme weather. See Restatement Torts, 3d, § 3, comment *l*, p 37; and *Golden & Boter Transfer Co v Brown & Sehler Co*, 209 Mich 503, 510; 177 NW 202 (1920) (in private tort-suit, defining an "act of God" as "those events and accidents which proceed from natural causes and cannot be anticipated and provided against, such as unprecedented storms, or freshets, lightning, earthquakes, etc[,]" and noting that defendant would not be liable for injuries caused by such an event).

[6] The GTLA provides blanket immunity to governmental entities engaged in governmental functions from tort suit, save for narrow, enumerated exceptions. MCL 691.1407 mandates that

-2-

raised under a narrowly-defined and strictly limited statutory exception[7] to governmental immunity.[8] Again: the Sewage Act[9] is intended to provide comprehensive and broad immunity, and limited tort liability,[10] to governmental entities, and any exceptions are interpreted narrowly

"except as otherwise provided in this act, a governmental agency is immune from *tort* liability if the governmental agency is engaged in the exercise or discharge of a governmental function." MCL 691.1407(1); *Maskery v Bd of Regents of Univ of Mich*, 468 Mich 609, 613; 664 NW2d 165 (2003) (emphasis added).

[7] "The judiciary's objective when interpreting a statute is to discern and give effect to the intent of the Legislature. Once the intent of the Legislature is discovered, it must prevail regardless of any rule of statutory construction to the contrary." *Menard Inc v Dep't of Treasury*, 302 Mich App 467, 471; 838 NW2d 736 (2013) (internal citations omitted). Legislative intent is most reliably discerned by "examining the language of the statute itself; if the language is clear and unambiguous, no further construction is necessary or allowed to expand what the Legislature clearly intended to cover." *People v Breidenbach*, 489 Mich 1, 8; 798 NW2d 738 (2011) (internal quotation marks omitted). Our Court is to "interpret the words in the statute in light of their ordinary meaning and their context within the statute and read them harmoniously to give effect to the statute as a whole." *Johnson v Recca*, 492 Mich 169, 177; 821 NW2d 520 (2012) (internal quotation marks omitted). "Statutes that relate to the same subject or share a common purpose are *in pari materia* and must be read together as one law, even if they contain no reference to one another." *Maple Grove Twp v Misteguay Creek Intercounty Drain Bd*, 298 Mich App 200, 212; 828 NW2d 459 (2012).

[8] See *Bosanic v Motz Development, Inc*, 277 Mich App 277, 284; 745 NW2d 513 (2007) ("[p]laintiffs can seek damages under the [Sewage Act] if they have stated valid claims with regard to its elements"). Further, "in construing [the Sewage Act], the one basic principle that must guide [the court's] decision is that the immunity conferred upon governmental agencies is *broad*, and the statutory exceptions thereto are to be *narrowly* construed." *Id*. at 282 (internal quotes and citations omitted; emphasis in original).

[9] The Sewage Act governs liability for torts that arise from "sewage disposal system event[s]," which are defined as: "the overflow or backup of a sewage disposal system onto real property." MCL 691.1416(k). The Legislature enacted these provisions in 2001 to abrogate the common-law trespass-nuisance doctrine, which the Legislature felt that the judiciary applied too freely. House Legislative Analysis, SB 109, December 11, 2001. The Sewage Act thus created a "more limited legal liability standard" that would make it more difficult for plaintiffs to prevail against governmental defendants in suits that involved sewage backups. *Id*. The aim of the statute is "to afford property owners, individuals, and governmental agencies greater efficiency, certainty, and consistency in the provision of relief for damages or physical injuries caused by a sewage disposal system event . . ." MCL 691.1417(1).

[10] MCL 691.1417 abrogates "common law exceptions, if any, to immunity for the overflow or backup of a sewage disposal system and provide[s] the *sole remedy* for obtaining any form of relief for damages . . . caused by a sewage disposal system event regardless of the legal theory." MCL 691.1417(2) (emphasis added).

In place of the common law, the Sewage Act makes "governmental agencies" liable for "the overflow or backup of a sewage disposal system" if the "overflow or backup is a sewage disposal

and strictly.[11] Plaintiff's attempt to shoehorn his cause of action into this statutory framework would radically expand governmental liability in a statute expressly designed to do just the opposite.

In other words, plaintiff has brought suit for recovery under a statute that is simply inapplicable to his lawsuit. The reason is clear. The Sewage Act provides very limited and strictly circumscribed *tort* liability for *sewage*-related events, not *contract*-based liability for *natural rainwater* flooding.[12] Stated differently, because the causative "event" in issue is rain, not sewage, and because the statute provides relief for claims that sound in tort, not contract, plaintiff has no claim under the Sewage Act.

That is, absent action by government that somehow diverts the natural flow of rainwater onto private property[13] that would otherwise not have experienced rain-caused flooding, the Sewage Act literally does not speak to or apply to the consequences of severe weather such as

---

system event" and the "governmental agency is an appropriate governmental agency." MCL 691.1417(2). The statute is careful to limit governmental liability through specific definitions of these terms, found in MCL 691.1416. And it creates no liability for mere statements or representations made by governmental entities or their agents. See MCL 691.1417(2).

[11] See n 8, *supra*.

[12] Again, by its own terms, the GTLA is a tort statute. MCL 691.1407(1). As all GTLA actions sound in tort, if a GTLA defendant asserts that he owed the plaintiff no duty or did not cause his injury, plaintiff must demonstrate that defendant owed him a duty and caused his injury. MCL 691.1412. The Sewage Act was explicitly designed to limit governmental liability for "sewage disposal system events." House Legislative Analysis, SB 109, December 11, 2011. It abrogates all common law theories for sewage-related claims, and constitutes the "sole remedy" for such actions. MCL 691.1417(2). A plaintiff therefore cannot use a common-law action to sue a governmental entity under the Sewage Act. *Id*. The Sewage Act does not create liability for mere statements or representations made by governmental agencies or their agents. See MCL 691.1417(2).

[13] See *Linton v Arenac Co Road Com'n*, 273 Mich App 107, 12l; 729 NW2d 883 (2006) (holding that plaintiff made valid MCL 691.1417 claim when defendant city dumped tree branches into public storm drainage ditch, obstructing water flow and forcing water onto plaintiff's property). We do not interpret *Linton* to say, as plaintiff's theory requires, that a city has an affirmative obligation and duty to protect citizens from the natural flow of rainwater. Instead, it holds governmental entities that take affirmative action that causes flooding—i.e., dumping tree branches into a drainage ditch, which causes a water backup, which caused flooding, which caused damages—are liable under the Sewage Act. *Id*. For a pre-Sewage Act application of this "affirmative action" principle, see for example, *Donaldson v City of Marshall*, 247 Mich 357, 359; 225 NW 529 (1929) ("[t]he city of Marshall was under no obligation to drain the plaintiff's land, but, when it established a drain in that vicinity, it became its duty to maintain it in such a way as to carry off the natural flow of the water, and if by reason of its failure to do so water accumulated on plaintiff's land *which otherwise would not have been there*, the city would be liable for any damages sustained") (emphasis added).

-4-

rainstorms.[14]   Again, the reason is obvious.  No law has ever imposed an obligation (and thus, liability) upon government to protect private property owners from acts of God or consequences of severe weather.[15]   Historically, this has been an issue for private property owners and their insurers, not an area of liability for cities and their tax-paying residents.[16]   And, there is nothing in this statute that remotely suggests that the Michigan Legislature made such a dramatic shift in public policy.   We should think that if such a seismic change was intended, Michigan's Legislature would have made this very clear.[17]   The Sewage Act strongly suggests the opposite result.  Again, its expressed intent is to strictly limit liability for sewage-related events caused by governmental entities.[18]

---

[14] It is doubtful from MCL 691.1416(j)'s plain language that the Sewer Act applies to events involving rainwater at all.  The listed types of sewers (including storm sewers) are all modified by the predicate "used or useful in connection with the collection, treatment, and disposal of sewage and industrial wastes."  As such, the Sewage Act does not seem to apply to any events that exclusively involve rainwater, as here, which have nothing to do "with the collection, treatment, and disposal of sewage and industrial wastes."  See *Fisher Sand and Gravel Co v Neal A Sweebe, Inc*, 494 Mich 543, 560; 837 NW2d 244 (2013) ("when the language of the statute is unambiguous, it must be enforced as written").

However, notwithstanding the statute's apparent total inapplicability to rainwater, we need not address this issue because plaintiff's claim fails for other reasons.

[15] See n 5, *supra*.

[16] Governmental entities have no duty to construct drainage infrastructure to catch surface rainwater.  See MCL 101.1 ("[t]he council of any city *may* establish, construct and maintain sewers and drains . . .") (emphasis added); *Ashley v City of Port Huron*, 35 Mich 296, 299; 24 Am Rep 552 (1877) (COOLEY, CJ) ("[flooding] might result from a failure to construct any sewer whatever; but clearly no action could be sustained for a mere neglect to exercise a discretionary authority"); *Kuriakuz v West Bloomfield Twp*, 196 Mich App 175, 177; 492 NW2d 757 (1992) (holding against plaintiffs for failing to show "that the township had an affirmative duty to construct a storm drainage system"); *McSwain v Twp of Redford*, 173 Mich App 492, 500; 434 NW2d 171 (1988) ("where . . . the governmental unit has no affirmative duty, by statute or otherwise . . . to construct a sanitary sewer, we do not believe it can be held liable for damage which might not have occurred had the sewer been constructed").

[17] "The Legislature is presumed to know the common law, and any abrogation of the common law must be explicit."  *Hamed v Wayne Co*, 490 Mich 1, 22 n 57; 803 NW2d 237 (2011).  As noted, governmental entities have never been held liable for failing to drain naturally occurring rainwater-flooding from private property.  Accordingly, if the Legislature wanted to expand government liability to encompass sewage- and rain-caused flooding, it would have enacted a statute that explicitly expressed such aims.

[18] To repeat: the Legislature enacted the Sewage Act with the explicit intent of further limiting the already narrow governmental liability for sewage- or rain-caused flooding.  This intent is explicitly expressed in the statute's language, which states that Sewage Act is the "sole remedy"

In brief, the city is not obliged by the Sewage Act to deal in any way with the consequences of rain that naturally flows from a higher to a lower elevation. In brief, the statute does not cover the event complained of, because it addresses sewage, not rain.

Because the Sewage Act does not create or impose the radical and dangerous theory advanced by plaintiff, and because plaintiff has no common-law cause of action against Ann Arbor, plaintiff cleverly couches his theory of recovery under a deceptively appealing contractual theory—"had the city built what it said it would,[19] my basement would not have flooded." But this is a tort statute, not a statue that speaks to contract-based liability.[20] Nothing in the plain language of the statute imposes liability or creates a duty premised on representations of the city.[21]

Close examination of every paragraph, every sentence and every word of the Sewage Act reveals nothing to support the idea that a city should be held liable for what it said or represented. To the contrary, the statute says expressly that it: (1) abrogates all common law theories of liability (this would include plaintiff's contract-based claim)[22]; and (2) is the sole means of recovery for *sewage*-related events, regardless of the legal theory advanced by any plaintiff.[23] And, because plaintiff's entire theory of recovery is predicated on words and representations, his entire theory of recovery sounds in contract, not tort[24]—and contract theories of liability are expressly abrogated by the statute and prohibited by its clear definitions.[25]

---

for sewage- or rain-caused flooding, and abrogates all common-law claims related to such flooding. MCL 691.1417(2). The statute's plain language thus mandates immediate rejection of plaintiff's claim.

[19] Again, plaintiff really means: had the city built drainage infrastructure that the private engineering firm said would be built. Were we nonetheless to allow plaintiff to plead his contract claim, it is unlikely he would prevail—the private engineering firm is at best an agent of the city, and principals are not always liable for the acts of their agents. See *City of Detroit v Corey*, 9 Mich 165, 184 (1861) ("[w]hen the relation of principal and agent, or master and servant exists, the rule of *respondeat superior* is applicable, but not when the relation is that of contractor only") (emphasis in original).

[20] See n 12, *supra*.

[21] There is simply nothing in the Sewage Act about words, statements, or representations, much less anything that binds the governmental entity to act in a certain way based on mere words, statements, or representations.

[22] Again: MCL 691.1417 abrogates "common law exceptions, if any, to immunity for the overflow or backup of a sewage disposal system and provide[s] the *sole remedy* for obtaining any form of relief for damages . . . caused by a sewage disposal system event regardless of the legal theory." MCL 691.1417(2) (emphasis added). See also n 8, *supra*.

[23] MCL 691.1417(2). See also n 9, *supra*.

[24] "[A] tort requires a wrong independent of a contract . . . the distinguishing feature of a tort is that it consists in the violation of a right given or neglect of a duty imposed by law, and not by contract." *In re Bradley Estate*, 494 Mich 367, 383; 835 NW2d 545 (2013) (internal quotation

This can be clearly demonstrated by simply removing the statement or representation on which plaintiff relies—"the city said it would build drainage infrastructure of a certain size." First, had the city built its infrastructure without saying a word, it would have no liability because it had no duty by law to do anything. Moreover, by plaintiff's own admission, Ann Arbor not only did not cause the flooding, or make it worse, but instead, reduced the amount of flooding.[26] Under these facts, there has never been a court decision in Michigan holding that the government breached a duty to a private property owner.

Thus, the only duty in plaintiff's telling arises because the city said it would build drainage infrastructure of a certain size.[27] In other words, the city's duty, under plaintiff's theory, is to do what it said it would do. But this is a contract theory, not tort, and not to be found in the Sewage Act. And what of the breach or defect? There is none. Unless it is premised on words, because the city did not build drainage infrastructure of the size it said it would—the defect is created by the words, the defect is the representation. Of course, as mentioned, the city's infrastructure reduced the amount of rain that otherwise would have been involved in the flooding. And what of causation? Clearly, the severe rainstorm and plaintiff's inexplicable building of a basement and an egress window in a flood plain across from a private retention basin that had overflowed in the past, would appear to be the cause in fact and proximate cause of plaintiff's damage.[28] Yet again, in plaintiff's telling, the cause is premised on the representation—"had the city only built to the size it said it would, my basement would not have experienced rain damage."

What emerges from plaintiff's hybrid theory of recovery is a cause of action premised solely on words—a cause of action that sounds in contract, not tort. Remove the words, there is no duty. Remove the words, there is no defect. Remove the words, there is no causation. We again emphasize that nothing in the Sewage Act even remotely suggests liability premised on representations and for good reason. Contract law, with its own peculiar principles and order and allocation of proofs, has no place in a tort statute, much less a self-defined tort statute that advances a public policy of broad governmental immunity, with strictly limited exceptions. Moreover, a cause of action that sounds in contract, such as plaintiff's, is in reality a common-

marks omitted). Said another way, "[a]s contract law rests upon obligations imposed by bargain, tort law rests upon obligations imposed by law." *Goossen v Estate of Standaert*, 189 Wis 2d 237, 250; 525 NW2d 314 (Wis App 1994). Cases from foreign jurisdictions are not binding, but can be persuasive. *People v Campbell*, 289 Mich App 533, 535; 798 NW2d 514 (2010).

[25] As common-law claims, contract suits are therefore expressly abrogated by and cannot be brought under the Sewage Act. MCL 691.1417(2).

[26] Again, plaintiff states in his brief: "*the Relief Sewer was able to handle only about one-fifth of the rainfall* generated by the June 2010 rain event . . ." (emphasis added).

[27] Again, see n 4, *supra*.

[28] The Sewage Act requires that the "defect" in the sewer be the "substantial proximate cause" of plaintiff's injury. MCL 691.1417(3)(e). "Substantial proximate cause" is defined to mean: "a proximate cause that was 50% or more of the cause of the event and the property damage or physical injury." MCL 691.1416(*l*).

law theory of recovery that is expressly abrogated by the Sewage Act. And, again, for good reason.

First, if we examine plaintiff's claim, he says he knew nothing about the historic flooding in his own neighborhood and presumably, therefore, is unable to claim that he relied on the representation of the city when he built his basement and egress window. Indeed, perhaps this anomaly is what led plaintiff to attempt to shoehorn his contract, representation-based theory of recovery under the Sewage Act. Second and more importantly, were we to accept a contract-based theory of recovery, this would create an endless and unpredictable stream of questions and problems. For example, would a plaintiff have to prove reliance on the representations in order to state a cause of action for detrimental reliance or promissory estoppel?[29] This theory or cause of action cannot be found anywhere in the Sewage Act. Further, if one administration were to make a statement of intent, would this bind a successor administration? The answer is certainly not in the Sewage Act. If the project is later judged to be too extravagant or expensive, or the city experiences financial crisis, can it be modified, downsized, abandoned, when, by whom and who could sue under such circumstances? Troubling questions with no answers in the Sewage Act, for obvious reasons.[30] This is a tort statute, not a statute that creates contractual-type liability.

## II. RESPONSE TO THE DISSENT

We respectfully disagree with the dissent's view of this case. As an introduction, let's make clear what this case does not involve. It does not involve a governmental entity that caused a flood. Plaintiff makes no allegation that Ann Arbor, by its direct action, diverted naturally

---

[29] Here, plaintiff makes no allegation that he relied on anything the city (or the private engineering firm) said or did, which means that even his contractual claim would fail—he cannot show that the city "promised" him anything, or that he relied on anything the city "promised" him. "The sine qua non of the theory of promissory estoppel is that the promise be clear and definite." *Derderian v Genesys Health Care Sys*, 263 Mich App 364, 381; 689 NW2d 145 (2004) (internal citations omitted).

[30] If we were to adopt plaintiff's radical theory that the Sewage Act creates liability for mere statements made by governmental entities, the next step for enterprising plaintiffs will be to hold local governments liable for any statement they have made related to drainage infrastructure. Illinois is already sliding down this slippery slope, where Farmer's Insurance recently used an Illinois statute similar to the Sewage Act to demand compensation from local governments that merely acknowledged potential flooding risks from climate change, but then did not expand their drainage infrastructure to cope with the supposedly increased risk of flooding. If adopted, such a cause of action would result in massive liability for local governments—effectively crippling their ability to provide basic services to their residents. See "U.S. Insurer Class Action May Signal Wave of Climate-Change Suits," Mica Rosenberg, Reuters <http://www.reuters.com/article/2014/05/16/usa-environment-insurance-idUSL1N0O11T620140516?feedType=RSS&feedName=everything&virtualBrandChannel=11563> (posted May 16, 2014) (accessed November 3, 2014).

flowing water or rainwater onto property that otherwise would not have been flooded. Nor did it fail to remove an obstruction in its drainage system that then led to a flood. And this case does not involve a sewage backup.

Again, this case involves a heavy rainstorm that caused a flood in a low-lying area of Ann Arbor that had historically experienced rain-caused floods. By plaintiff's own admission, Ann Arbor, without any legal obligation to do so, built drainage infrastructure that helped *reduce* the amount of rain on his property. Nonetheless, plaintiff has brought suit against defendant because a large storm caused a flood of rainwater that broke through his basement window and caused him damages. To substantiate his action, plaintiff points to a 1990 statement made by the private engineering firm that designed the drainage infrastructure near his property, which indicated the infrastructure could drain a specific amount of water. However, the drainage infrastructure, as built, can drain less than this specific amount of water. Plaintiff claims and the dissent insists this is a "defect" under MCL 691.1416, which abrogates governmental immunity, and that Ann Arbor should pay him money for the damages his property suffered during the flood.

There is a fatal flaw to this claim, of which the dissent is aware. As it admits, neither the Sewage Act, the wider GTLA, nor any common law has *ever* imposed a duty upon governmental entities to prevent damage to private property caused by extreme weather, such as flooding caused by a rainstorm. This state of affairs raises a serious problem and question for plaintiff and the dissent: If a city has no duty to provide drainage infrastructure to remove rainwater from private property, how can it have a duty to remove more rainwater than it said it would from plaintiff's property? In other words, if the city has no duty to capture *any* rain, how can it have a duty to capture *more* rain?

Simple, according to the dissent. Because Ann Arbor's relief sewer is "undersized"— i.e., it isn't as big as the private engineering firm that designed it said it would be—it is "defective" by design per MCL 691.1416(e). The supposed "defects" cataloged by the dissent are merely restatements of the above sentence in new terms.

But the dissent's answer to our original question—"if the city has no duty to capture any rain, then how can it have a duty to capture more rain?"—isn't really an answer at all. Because its answer—"a relief sewer with an inadequate capacity is a defective relief sewer"—begs yet another question, which circles back to the first: on what does plaintiff base his assertion that the relief sewer is of "inadequate" capacity and thus "defective" under MCL 691.1416(e)? The answer, of course, is: plaintiff's entire suit, and the dissent's analysis, hinge on a single statement made by the private engineering firm about the capacity of the relief sewer.

To see how, let's deconstruct the dissent's argument. The dissent notes that the private engineering firm professed an intention to design a relief sewer that could collect 3.25 inches of rainfall. This statement provides the dissent with its point of entry to MCL 691.1417: because the relief sewer, as built, did not actually collect 3.25 inches of rainfall, it is "defective" under MCL 691.1416(e), and thus creates liability for defendant under MCL 691.1417(3)(b). The statement is also the root of Ann Arbor's supposed breach of duty, because Ann Arbor knew the relief sewer had not solved all the flooding problems in plaintiff's neighborhood. And it is the so-called "substantial proximate cause" of plaintiff's damages, because if the sewer had been

able to accommodate 3.25 inches of rainfall, as the private engineering firm said it would be able to, plaintiff's basement would not have been flooded during the rainstorm.

Plaintiff's and the dissent's reliance on the private engineering firm's statement is its undoing. The less flattering corollary of "the dissent's entire analysis hinges on a single statement" is "without that single statement, the dissent's analysis is wrong." Indeed, under plaintiff's theory, it is—if the private engineering firm had said nothing as to the intended capacity of the relief sewer, plaintiff would unquestionably have no cause of action under MCL 691.1417. The sewer would not be "defective" under MCL 691.1416(e), because governmental agencies have no duty to build drainage infrastructure, nor does MCL 691.1417 create any such duty. The fact that Ann Arbor did build infrastructure would be inconsequential, as plaintiff would have no frame of reference by which to claim that the relief sewer was "defective," or that the relief sewer's capacity "caused" him damages under MCL 691.1417(3)(e). Duty, breach, causation—the dissent provides no independent justification for any of these essential tort concepts and relates each back to the private engineering firm's statement.

The testimony of plaintiff's expert witness, engineer Clif Seiber, only serves to further illustrate this fatal flaw. Seiber's report is replete with references to what the private engineering firm stated it would build—how much water the relief sewer was supposed to accept, how much rainfall the sewer was intended to handle. Plaintiff's own statements at the April 2012 motion for disposition and his appellate brief echo this analysis, stressing that the sewer was undersized based on the statement of the private engineering firm.

The singular importance of the private engineering firm's statement to plaintiff's claim, then, is relevant for two reasons. First, it reveals that plaintiff's claim does not sound in tort. Insofar as it sounds anywhere, it sounds in contract. Again: "a tort requires a wrong independent of a contract . . . the distinguishing feature of a tort is that it consists in the violation of a right given or neglect of a duty imposed by law, and not by contract." *In re Bradley Estate*, 494 Mich 367, 383; 835 NW2d 545 (2013). Plaintiff does not allege that Ann Arbor owes him any legal duty independent of the statement the private engineering firm made about the relief sewer's capacity.

Second, were plaintiff to do so—were he to claim that the private engineering firm's 1990 statement about the capacity of the relief sewer *created a duty* for Ann Arbor to build drainage infrastructure of exactly that capacity—his claim would contravene centuries of common law, statutory law, and radically expand the scope of municipal liability.[31] To repeat: governmental entities do not have a duty to build drainage infrastructure. Accordingly, they have never been liable under the Sewage Act or common law for acts of God, such as rain-caused floods. The Sewage Act does not mandate that governmental entities prevent all harm caused by natural rainwater flooding of private property. Rather, it mandates that governmental entities *do no harm*, by making them liable for drainage backups that are "substantial[ly] proximate[ly] cause[d]"[32] by their affirmative actions.[33] The dissent does not recognize this

---

[31] See n 5, supra.

[32] MCL 691.1417(3)(e).

distinction, which is crucially important when interpreting a statute that is explicitly intended to *limit*—not expand—governmental liability.[34]

The dissent also does not apply these legal principles to the factual background of this case. Again, the Sewage Act does not mandate that governmental entities prevent all harm—rather, it mandates that governmental entities do no harm. Here, defendant did not take any affirmative action that led to plaintiff's damages. In fact, its actions, which, again, it was not required to take, actually *helped* plaintiff by lessening the damage plaintiff otherwise would have suffered during the June 5–6, 2010 rainstorm.

The dissent devotes considerable energy to rehashing plaintiff's "evidence" of how the "defective"—i.e., undersized—nature of the relief sewer "caused" his injuries. But "undersized" means nothing legally if the city has no duty to collect any rain—or in plaintiff's telling, more rain—than the relief sewer actually did. The "evidence" of the relief sewer's "undersized" nature includes the (hardly scientific) statement of plaintiff's neighbor that the relief sewer "never made things better," in that it supposedly did not "solve" the problem of the rain-caused flooding in plaintiff's neighborhood. This statement is illogical. Whatever its alleged shortcomings (if any), the relief sewer had some capacity to remove water from the surface—it is an unobstructed hole in the ground, and unobstructed holes collect rain and surface water.[35] Again, plaintiff admits as much in his brief when he states: "[d]ue to design defects, the Relief Sewer *was able to handle only about one-fifth of the rainfall generated by the June 2010 rain event . . .*" (emphasis added).[36]

The dissent's analysis misses this crucial point. To repeat: nothing defendant did made the flooding worse. Nothing defendant did diverted more water into plaintiff's basement. Again, defendant's actions actually *reduced* the amount of rain that would have been involved in the flood absent the relief sewer. Therefore, as a matter of objective reality, the relief sewer cannot conceivably be the cause of the flooding at issue.

Nor does the dissent address the obvious outcomes of adopting plaintiff's theory of liability as binding precedent. Ideas have consequences, and the dissent's refusal to grapple with the consequences of its ideas are indicative of the weakness of its ideas.

As noted, the adoption of plaintiff's legal theory will cause municipalities to face unprecedented liability for mere statements of intent related to drainage infrastructure. Under the

---

[33] See n 13, supra.

[34] *Bosanic*, 277 Mich App at 282 (internal quotation marks and citations omitted; emphasis in original) ("in construing [the Sewage Act], the one basic principle that must guide [the court's] decision is that the immunity conferred upon governmental agencies is *broad*, and the statutory exceptions thereto are to be *narrowly* construed").

[35] Plaintiff's expert witness stated in his report that the relief sewer was unobstructed and that "system obstructions were not the cause of the June, 2010 flooding."

[36] Defendant's expert witness, Mark Pribak, noted the same, observing that the sewer "will accept a certain flow and provides a certain amount of relief to whatever that upstream flow is."

dissent's interpretation of the Sewage Act, if a governmental entity says it is going to build drainage infrastructure of a specific capacity, and the infrastructure, as built, does not drain that exact amount of water, the drain will be "defective" and the governmental entity will be liable for damages.

Municipalities will move to eliminate such liability in two ways. First, they will refuse to be transparent about new storm-sewer infrastructure, and will not inform residents about the intended capacity or design specifications of the new projects. Or, worse, municipalities may simply refuse to build new drainage infrastructure altogether. If a municipality has no duty to help its citizens (read: future plaintiffs) with rain-caused floods, and will face potentially crippling liability if it seeks to alleviate the flooding (meaning its taxpayers would pay for suits and damage awards), why offer any assistance at all? Under such a legal regime, Michiganders would face more floods, more water damage, and more safety risks. This was certainly not the intent of the Legislature when it enacted the Sewage Act and we refuse to construe the statute in such a way that will create that outcome.

## III. CONCLUSION

For the reasons stated above, the Sewage Act simply provides no relief to plaintiff. Accordingly, his claim is hereby dismissed.

Reversed.

/s/ Henry William Saad

-12-