*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

JANE S. KUHN,

      Plaintiff-Appellant,

v

CITY OF GIBRALTAR and DEREK M. THIEL,

      Defendants-Appellees,

and

TIMOTHY MCLEAN,

      Defendant.

UNPUBLISHED
January 4, 2024

No. 364027
Wayne Circuit Court
LC No. 21-006302-NO

Before: GLEICHER, C.J., and GARRETT and MALDONADO, JJ.

PER CURIAM.

In this action seeking damages arising from a sewage disposal system (SDS) event, plaintiff Jane Kuhn appeals as of right the trial court's order granting summary disposition in favor of defendants, the City of Gibraltar and Derek Thiel.[1] Because Kuhn failed to establish a question of fact as to whether a defect in Gibraltar's SDS was a substantial proximate cause of her injury, summary disposition for Gibraltar was warranted. And because Kuhn has identified no grossly negligent conduct by Thiel, summary disposition was properly granted in his favor. We affirm.

---

[1] Defendant Timothy McLean was dismissed by stipulation, and Kuhn's claim against him is not at issue in this appeal. Our use of the collective term "defendants" will refer to Gibraltar and Thiel only.

-1-

## I. FACTUAL HISTORY

Kuhn is a long-time resident of Gibraltar. As shown on the map below, her home is situated on the city's main island, surrounded by the Detroit River and located just north of the intersection at Stoeflet Street and Adams Drive.[2]



In July 2019, Kuhn's son was installing a new mailbox on her property. Kuhn walked down her driveway and into standing water to join her son. Kuhn slipped and fell on a "clear slimy substance" at the intersection of the driveway and sidewalk. After falling, Kuhn landed in the street, and her body was submerged in water that was over two feet deep. Kuhn alleged that she had experienced repeated pooling of water at her property since 2017 and that the pooling remained

---

[2] The map was proffered by defendants for the first time on appeal. Although this Court's review is generally limited to the record developed in the trial court, defendants correctly note that a map is an appropriate subject of judicial notice. See MRE 201(b) ("A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to resources whose accuracy cannot reasonably be questioned.").

for weeks at a time. The following photograph depicts the situation around the time of Kuhn's fall as viewed from her driveway.



Kuhn's complaint alleged that the SDS that was supposed to remove surface water from the area was inadequate, defective, or both for several years and allowed water to collect in the street, sidewalk, and adjacent private property. Although the governmental tort liability act (GTLA), MCL 691.1401 *et seq.*, affords broad immunity in most circumstances to governmental agencies and their employees, Kuhn sought damages from Gibraltar under the SDS event exception, MCL 691.1417, and from Thiel, the former city administrator and head of the department of public works (DPW), on the basis of his gross negligence, MCL 691.1407(2)(c).

The design and intended functioning of the relevant storm water system is undisputed. The system collects water from the surface in a series of catch basins, which then flows through pipes into the Detroit River. The pipes increase in diameter as they get closer to the outfall, thus allowing the water to flow with the force of gravity, without the need for a pump or other mechanism to propel the water through the system. The particular system at issue runs north along Adams, then east along Grandview Drive, where the pertinent outfall is located. The Grandview outfall is equipped with a pinch valve which opens when the pressure of the surface water in the pipes reaches a sufficient level. When that pressure dissipates upon the release of the water into the river, the valve closes to prevent river water from flowing into the system.

Throughout discovery, witness testimony established that flooding from the Detroit River was a persistent problem in Gibraltar.[3]  To help remediate the situation, the city deployed portable pumps at some of the most affected sites to drain water during periods of higher water levels and flooding.  No pump was installed at the Stoeflet and Adams intersection.  According to Robert Tomasik, the DPW employee running day-to-day operations, this intersection was on the department's radar but the flooding was not as concerning as other locations.  Whereas the flooding at Stoeflet and Adams was primarily limited to the road, Tomasik explained that other areas of town experienced "flooding [of] a whole neighborhood around their homes and everything." Tomasik asked Thiel for additional employees to address the flooding, but Thiel declined the request for budgetary reasons.  As for the effectiveness of the pumps, Thiel testified that, depending on the level of flooding, the pumps did not necessarily help.  Thiel pointed out that several areas of Gibraltar where pumps had been deployed still experienced significant flooding, with the situation only resolving itself once river levels receded.  Thiel concluded, and most deposed witnesses generally agreed, that the likely cause of the standing water around Kuhn's property was flooding conditions that stemmed from higher water levels on the river.  Reports from the National Oceanic and Atmospheric Administration (NOAA), introduced below by Kuhn, reveal that water levels generally rose between 2016 and 2019.  Compared across each year's July data, the average water level increased by about two feet.  In July 2019, the maximum elevation on the river came twelve days before Kuhn's injury.

Kuhn's theory of the case, however, was that a defect in the pinch valve at the Grandview outfall caused the persistent flooding.  Souheil Sabak, the owner of Charles E. Raine Company (CERC), an engineering firm with which Gibraltar contracted, helped prepare an asset management plan in 2018 that assessed the city's storm water system.  Sabak believed that the flooding by Kuhn's property was not necessarily indicative of a defect but rather "water being unable to dissipate because of the lake elevation."  He conceded, however, that if the water level was high enough, it could "prevent the pinch valve from opening[,] causing a backup."  Further, Ronald Tyson, a retained expert for Kuhn, opined that the valve may not have been operating as designed.  Although Tyson did not inspect the valve himself, he faulted the city for failing to do so and noted that an inspection "may have determined that a replacement valve was needed to accommodate differences in water depth . . . ."  He also asserted, at a minimum, that installation of a pump at the intersection of Stoeflet and Adams would have remedied the standing water.

Defendants moved for summary disposition under MCR 2.116(C)(7), (8), and (10).  In pertinent part, they argued that summary disposition for Gibraltar was warranted because Kuhn could not prove two essential elements of her SDS event claim—that there was a defect in the SDS and that the defect was a substantial proximate cause of the event and her injuries.  Defendants claimed that the flooding near Kuhn's property was caused by Gibraltar's low elevation and increasingly high water levels in the Detroit River.  And defendants contended that Kuhn could not establish that any alleged defect was a substantial proximate cause of the standing water.  As

---

[3] Witnesses sometimes described high water levels on the lake.  The Detroit River feeds into Lake Erie, so various individuals used the river and lake interchangeably to refer to the body of water surrounding Gibraltar.

-4-

for the claim against Thiel, defendants argued that there was no evidence Thiel had been grossly negligent or was the proximate cause of Kuhn's injuries.

Kuhn argued in response that Gibraltar's storm water system was defective because, for years, it could not fully drain the intersection at Stoeflet and Adams. Despite the persistent flooding, Kuhn claimed that defendants never consulted the city's contracted engineers to resolve the design flaw, determine the cause of the backup, or explore appropriate remedies. In fact, there was no evidence that defendants did any maintenance of the pertinent system or outfall for over 15 years, beyond a visual inspection in 2017. Kuhn reasoned that a fact-finder could view defendants' failure to address increasing river elevation—despite ongoing flooding—as a reflection of a design failure or lack of maintenance. But Kuhn offered no argument that this defect was a substantial proximate cause of the SDS backup and her injuries. As for Thiel, Kuhn argued that a jury could find his inaction in the face of persistent flooding to constitute gross negligence.

The trial court concluded that Kuhn's evidence of a defect was speculative. The court took judicial notice that southeast Michigan had been plagued with intense rains over the past five years and suggested that the flooding was caused by an "act of God." Although Kuhn had suffered an "unfortunate accident," she had not established any defect in the SDS or shown that any defect constituted a substantial proximate cause. Therefore, the court granted summary disposition for Gibraltar. The court also held that Kuhn presented no evidence of gross negligence by Thiel, so he too was entitled to summary disposition.

## II. STANDARD OF REVIEW

This appeal presents questions of law—whether the trial court properly granted defendants' motion for summary disposition on the basis of governmental immunity—that we review de novo. *Eplee v Lansing*, 327 Mich App 635, 644; 935 NW2d 104 (2019). That means we give "respectful consideration, but no deference" to the trial court's ruling. *Wasik v Auto Club Ins Assoc*, 341 Mich App 691, 695; 992 NW2d 332 (2022). Defendants moved for summary disposition under MCR 2.116(C)(7), (8), and (10), but the trial court did not indicate under which subrule it was granting defendants' motion. Because the parties presented evidence beyond the pleadings, we review the trial court's decision as though it was granted under subrules (C)(7) and (10) only. *Nuculovic v Hill*, 287 Mich App 58, 62; 783 NW2d 124 (2010).

Summary disposition is appropriate under subrule (C)(7) when a claim is barred by "immunity granted by law." MCR 2.116(C)(7). This case involves a claim of immunity under the GTLA, a statutory scheme which "affords broad immunity from tort liability to governmental agencies and their employees whenever they are engaged in the exercise or discharge of a governmental function." *Beals v Michigan*, 497 Mich 363, 370; 871 NW2d 5 (2015). To avoid dismissal because of governmental immunity, a plaintiff must plead a claim that fits within one of the GTLA's statutory exceptions. *Mack v Detroit*, 467 Mich 186, 204; 649 NW2d 47 (2002). This Court narrowly construes those exceptions. *Beals*, 497 Mich at 370. When reviewing a motion under MCR 2.116(C)(7), including one based on governmental immunity, "a reviewing court must consider all affidavits, pleadings, and other documentary evidence submitted by the parties and construe the pleadings and evidence in favor of the nonmoving party." *Anzaldua v Neogen Corp*, 292 Mich App 626, 629; 808 NW2d 804 (2011). If a genuine issue of material fact exists after

properly considering all the evidence, dismissal is inappropriate. *Dextrom v Wexford Co*, 287 Mich App 406, 429; 789 NW2d 211 (2010).

MCR 2.116(C)(10) tests the factual sufficiency of the claim. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 160; 934 NW2d 665 (2019). Under this subrule, a trial court may only grant summary disposition if, considering all evidence submitted by the parties in the light most favorable to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Houston v Mint Group, LLC*, 335 Mich App 545, 557; 968 NW2d 9 (2021). "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003).

## III. CLAIM AGAINST GIBRALTAR

We begin with Kuhn's claim of liability against Gibraltar relating to an SDS event. Kuhn argues that the trial court erred by dismissing this claim because she established questions of fact on each element of an SDS event claim.

Under the SDS event exception to the GTLA,

> A governmental agency is immune from tort liability for the overflow or backup of a sewage disposal system unless the overflow or backup is a sewage disposal system event and the governmental agency is an appropriate governmental agency. [MCL 691.1417(2).]

That is, the SDS event exception immunizes governmental agencies "unless (1) there is a sewage disposal system event and (2) the governmental agency is an appropriate governmental agency." *Sunrise Resort Ass'n, Inc v Cheboygan Co Rd Comm*, 511 Mich 325, 334; ___ NW2d ___ (2023).

The statute defines a "sewage disposal system event" as "the overflow or backup of a sewage disposal system onto real property." MCL 691.1416(k). And a "sewage disposal system" includes "a storm water drain system under the jurisdiction and control of a governmental agency." MCL 691.1416(j). When seeking compensation for physical injury allegedly caused by an SDS event, a plaintiff must establish that "all of the following existed at the time of the event":

> (a) The governmental agency was an appropriate governmental agency.
>
> (b) The sewage disposal system had a defect.
>
> (c) The governmental agency knew, or in the exercise of reasonable diligence should have known, about the defect.
>
> (d) The governmental agency, having the legal authority to do so, failed to take reasonable steps in a reasonable amount of time to repair, correct, or remedy the defect.
>
> (e) The defect was a substantial proximate cause of the event and the property damage or physical injury. [MCL 691.1417(3).]

Each of these five requirements is an essential element of an SDS event claim, such that a failure of proofs on any single element is dispositive. *Willett v Waterford Charter Twp*, 271 Mich App 38, 50; 718 NW2d 386 (2006). In this case, the parties dispute whether the SDS had a defect and whether that defect was a substantial proximate cause of the event and injury.

## A. DEFECT

Kuhn first argues that she submitted sufficient evidence of a defect in Gibraltar's SDS to withstand summary disposition.

The GTLA defines a "defect" as "a construction, design, maintenance, operation, or repair defect." MCL 691.1416(e). Because the GTLA's definition is circular, this Court has turned to a dictionary definition of the word and concluded that a "defect" refers to " 'a fault or shortcoming; imperfection.' " *Willett*, 271 Mich App at 51, quoting *Random House Webster's College Dictionary* (1997). Thus, under MCL 691.1417(3)(b), Kuhn had to establish that there was a fault, shortcoming, or imperfection in the construction, design, maintenance, operation, or repair of the SDS.

The trial court concluded that Kuhn's evidence of a defect in the system was too speculative to create a genuine issue of material fact.[4] Kuhn challenges this conclusion on several grounds, arguing that there must have been a defect in the valve and that the city's inaction in the face of changed circumstances affecting the functioning of the system amounted to a defect in maintenance, operation, or design. Viewing the evidence in the light most favorable to Kuhn, we conclude that she established a genuine issue of material fact regarding the existence of a maintenance defect in the SDS. Gibraltar's failure to take any corrective steps for the two years of intermittent flooding that occurred before Kuhn's injury could be viewed by a reasonable fact-finder as evidence of a maintenance defect.

Kuhn presented evidence that pooling water on her property persisted for weeks or months at a time since 2017 and that city employees, including Thiel and Tomasik, were aware of the problem. Thiel testified that he asked Tomasik to look into the cause of the flooding, but Tomasik had no recollection of being asked to investigate. Tomasik apparently went to the Grandview outfall on his own initiative, but only to determine whether the valve had fallen off or rotted. Thiel believed that the system was cleaned on some sort of regular schedule, but did not know the details. He opined that the cleaning records would likely be in CERC's possession, but there is no indication that such records were produced or that they reflected regular cleaning or inspection. Tomasik indicated that Brent Florek, a CERC employee, did annual inspections of the outfalls.

---

[4] We place no weight on the trial court's view that the flooding in Gibraltar stemmed from an "act of God." An "act of God," for purposes of a legal defense, is generally understood as an "unusual, extraordinary, and unexpected manifestation of the forces of nature" and one that "require[s] the entire exclusion of human agency from the cause of the injury or loss." *Potter v Battle Creek Gas Co*, 29 Mich App 71, 75; 185 NW2d 37 (1970). Defendants presented no evidence that the flooding here resulted from unprecedent, unforeseen storms, such that only an "act of God" was responsible.

-7-

Bruce Hammond, another CERC employee, assisted Florek with an inspection in 2017 and explained that they evaluated the outfall from the shore without physically inspecting the pipe or valve. Hammond did not inspect the outfall at any other time, nor did he have reason to believe that Florek had done so. Sabak testified that he did not determine the cause of the pooling water and that CERC did not do a camera inspection or any other kind of study for that purpose. But he acknowledged that higher water elevation could impair the function of the valve and cause a backup.

In *Willett*, this Court considered the nature of a maintenance defect, noting that the definition of "maintain" includes " 'to keep in due condition, operation, or force.' " *Willett*, 271 Mich App at 51, quoting *Random House Webster's College Dictionary* (1997). The evidence regarding Gibraltar's maintenance of the system was inconsistent at best, with no witness able to identify the type or frequency of maintenance performed. And there was simply no evidence that the city undertook any effort to evaluate the continued viability of the system after the area it serviced was repeatedly plagued by pooling water for at least two years. Because there is no indication that the city's maintenance efforts kept the system in due condition, operation, or force, a reasonable fact-finder could determine that the city's maintenance of the system was deficient and constituted a defect. As such, the trial court erred by concluding that Kuhn failed to present sufficient evidence to create a question of fact regarding the existence of a defect under MCL 691.1417(3)(b). Reasonable minds could differ about whether there was a defect in the maintenance of the SDS, and summary disposition for failure to support that element was inappropriate.

## B. SUBSTANTIAL PROXIMATE CAUSE

Kuhn also argues that the trial court erred by concluding that she failed to present sufficient evidence to create a question of fact regarding the substantial proximate cause element of her claim.

As noted earlier, claimants seeking damages under the SDS event exception must demonstrate that "[t]he defect was a substantial proximate cause of the event *and* the property damage or physical injury." MCL 691.1417(3)(e) (emphasis added). The GTLA defines "substantial proximate cause" as "a proximate cause that was 50% or more of the cause of the event and property damage or physical injury." MCL 691.1416(*l*). Thus, Kuhn must establish that a question of fact exists that the alleged defect in the system was 50% or more of the cause of (1) the SDS event *and* (2) her physical injury. See *Fingerle v Ann Arbor*, 308 Mich App 318, 340; 863 NW2d 698 (2014) (O'CONNELL, J., concurring).[5]

Kuhn's argument runs into an immediate obstacle under the burden-shifting framework for reviewing a motion for summary disposition under MCR 2.116(C)(10). "When making a motion under MCR 2.116(C)(10), the moving party must 'specifically identify the issues as to which the moving party believes there is no genuine issue as to any material fact.' " *Barnard Mfg Co, Inc v*

---

[5] The Supreme Court vacated the majority opinion in *Fingerle* but affirmed this Court's judgment for the reasons stated by Judge O'CONNELL. *Fingerle v Ann Arbor*, 498 Mich 910 (2015).

*Gates Performance Engineering, Inc*, 285 Mich App 362, 369; 775 NW2d 618 (2009), quoting MCR 2.116(G)(4). The moving party must also support its motion with affidavits, depositions, or other documentary evidence. *Id*. Defendants met their burden in their motion for summary disposition; they argued that there was no material factual dispute on the substantial proximate cause element and supported their position with documentary evidence. The burden then shifted to Kuhn as the opposing party to establish that a genuine issue of material fact existed. See *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996). Kuhn could not rely on the "mere allegations" in her complaint but had to "by affidavits or as otherwise provided in this rule, set forth specific facts showing that there is a genuine issue for trial." MCR 2.116(G)(4). Yet Kuhn's response to defendants' motion for summary disposition was devoid of any argument that a defect in the SDS was a substantial proximate cause of the water backup and her injury.[6] In failing to address substantial proximate cause in her response to their motion for summary disposition, Kuhn identified no specific facts establishing a genuine dispute of fact on this element. This failure to properly respond to defendants' motion renders Kuhn's argument meritless on appeal. See *Barnard Mfg Co*, 285 Mich App at 374-375 (noting that the nonmoving party referenced no evidence creating a disputed fact on the moving party's claims and therefore "essentially left [the moving party]'s evidence completely unrebutted"). Kuhn did not "set forth specific facts showing that there is a genuine issue for trial" on substantial proximate cause. MCR 2.116(G)(4).[7] Because the failure to establish every element of an SDS event claim is dispositive,

---

[6] For this reason, we could also conclude that Kuhn waived any argument about substantial proximate cause. See *Tolas Oil & Gas Exploration Co v Bach Services & Mfg, LLC*, ___ Mich App ___, ___; ___ NW2d ___ (2023) (Docket No. 359090); slip op at 2-3 (noting that under Michigan's "raise or waive" rule, failure to raise an issue in the trial court renders the issue waived on appeal). Nevertheless, because the trial court ruled on this issue and because it "involves a question of law and the facts necessary for its resolution have been presented," we exercise our discretion to consider it. *Id*. at ___; slip op at 3 (cleaned up).

[7] Even if we independently reviewed the record evidence, reasonable minds could not conclude that any alleged defect in the SDS was a substantial proximate cause of Kuhn's *injury*. Kuhn testified that she walked down her driveway into standing water—which she claimed was present for "[m]onths, even going back years"—and then slipped and fell on a "clear slimy substance" where her driveway intersected with the sidewalk. Kuhn's conscious choice to confront the standing water, of which she was well aware, was a significant contributor to her injury. See *Fingerle v Ann Arbor*, 498 Mich 910 (2015) (affirming this Court's decision for the reasons stated in Judge O'CONNELL's concurring opinion, which, in holding that the plaintiff failed to make the requisite showing of substantial proximate cause, considered all factors that played a role in causing the event and damage, including fault that could be attributed to the plaintiff). The evidence also established that other factors besides an SDS defect played a role in causing Kuhn's injuries, namely the rising water levels of the Detroit River. As noted, the average water elevation of the river had increased by about two feet from 2016 to 2019. Considering all relevant factors, a reasonable factfinder could not conclude that any alleged defect was a greater-than-50% cause of Kuhn's injury.

see *Willett*, 271 Mich App at 250, the trial court did not err by granting Gibraltar's motion for summary disposition under MCR 2.116(C)(10).

## IV. CLAIM AGAINST THIEL

Finally, Kuhn argues that a question of fact remains whether Thiel is immune from tort liability for his alleged actions.

The GTLA authorizes immunity from tort liability for governmental employees when the following conditions are shown:

> (a) The . . . employee . . . is acting or reasonably believes he or she is acting within the scope of his or her authority.
>
> (b) The governmental agency is engaged in the exercise or discharge of a governmental function.
>
> (c) The . . . employee's . . . conduct does not amount to gross negligence that is the proximate cause of the injury or damage. [MCL 691.1407(2).]

The dispute here turns on the last requirement—whether Thiel's conduct amounted to gross negligence that was the proximate cause of Kuhn's injury.

The GTLA defines "gross negligence" as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." MCL 691.1407(8)(a). Put differently, employee liability under the GTLA is limited to times when the employee's conduct is "substantially more than negligent." *Maiden v Rozwood*, 461 Mich 109, 122; 597 NW2d 817 (1999). Therefore, "evidence of ordinary negligence does not create a material question of fact concerning gross negligence." *Id*. at 122-123. This Court has characterized gross negligence as "almost a willful disregard of precautions or measures to attend to safety and a singular disregard for substantial risks." *Tarlea v Crabtree*, 263 Mich App 80, 90; 687 NW2d 333 (2004). "Generally, allegations or evidence of inaction or claims that a defendant could have taken additional precautions are insufficient" to establish gross negligence. *Bellinger v Kram*, 319 Mich App 653, 660; 904 NW2d 870 (2017), citing *Tarlea*, 263 Mich App at 84-86, 90-92. "Although questions regarding whether a governmental employee's conduct constituted gross negligence are generally questions of fact for the jury, if reasonable minds could not differ, summary disposition may be granted." *Wood v Detroit*, 323 Mich App 416, 424; 917 NW2d 709 (2018).

Kuhn argues that there was a question of fact as to Thiel's gross negligence because he did nothing to analyze or correct the flooding problem, which demonstrated reckless disregard for safety. In support of this claim, Kuhn faults Thiel for failing to investigate the issue and for delegating responsibility to Tomasik. She also alleges that Thiel should have consulted with CERC about the persistent flooding and the appropriate placement of pumps; Thiel also should have directed installation of a pump near Kuhn's property to alleviate the flooding. Kuhn's arguments can aptly be summarized as complaints that Thiel's passive approach to the situation constituted gross negligence. This theory lacks merit because, as noted, "allegations or evidence

-10-

of inaction or claims that a defendant could have taken additional precautions" are generally insufficient to establish gross negligence. *Bellinger*, 319 Mich App at 660.

The evidence established that, although Thiel was director of the DPW by name,[8] Tomasik carried out the day-to-day work of the department. Tomasik testified that he did not regularly meet or receive direction from Thiel, but city leadership at some point directed him to deploy pumps around the city as water levels on the Detroit River rose. Although Thiel testified that he specifically asked Tomasik to investigate the flooding in and around Kuhn's property, Tomasik did not recall such a conversation. Regardless, Tomasik admittedly knew about the issue and noted that installing a pump near Kuhn's property was on the department's radar. Kuhn has not shown that any actions (or inactions) taken by Thiel rose to the level of "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." MCL 691.1407(8)(a). Nor is there any evidence that Thiel willfully disregarded the risk to Kuhn's property from flooding. See *Tarlea,* 263 Mich App at 90. Thiel delegated flooding remediation to Tomasik, and on occasion, to private contractors hired by the city. In turn, Tomasik worked with limited resources to mitigate flooding throughout the city. Simply put, there is no evidence that the decision not to place a pump near Kuhn's property, to the extent it can be attributed to Thiel, reflected a substantial lack of concern for any injury that Kuhn might suffer.

Relying on *Kendricks v Rehfield*, 270 Mich App 679; 716 NW2d 623 (2006), Kuhn suggests that this case is different because the passage of time can elevate mere negligence to the level of gross negligence. In *Kendricks*, 270 Mich App at 680, the plaintiff's twin brother was arrested in Detroit in connection with an offense committed in Livonia. Yet the defendants, Livonia police officers, arrested the plaintiff despite having been informed by Detroit officers that his brother—the actual suspect—had been arrested already. *Id*. at 680 & n 1. The defendants ignored the plaintiff's claims of mistaken identity and held him in jail for seven months before the mistake was rectified. *Id*. at 680. This Court held that there was a question of fact regarding gross negligence; even if the plaintiff's arrest and initial detention were reasonable mistakes, the continued incarceration of the plaintiff for seven months was not remotely reasonable. *Id*. at 682-683. Notably, the defendants had ready access to fingerprints and photographs that would have confirmed the plaintiff's identity, yet he remained incarcerated without cause for over half a year. *Id*. at 683.

In this case, the record suggests that the flooding began in 2017 and that Thiel had some knowledge of the problem near Kuhn's intersection for about two years before her injury. Although the length of time in this case is greater than in *Kendricks*, two factors render the instant facts distinguishable. First, in *Kendricks*, the defendants could have easily discovered their mistake with minimal effort by consulting readily accessible records, whereas the flooding issue did not have a "quick fix" that was ignored by Thiel. Flooding was a problem throughout the city, and the DPW had to prioritize those areas that experienced the worst flooding. Tomasik, not Thiel, was the individual primarily tasked with addressing the issue. And even if Thiel had specifically

---

[8] Thiel testified that as Gibraltar's city administrator, his primary "responsibilities included being DPW director, DDA [Downtown Development Authority] director, planning commission, [and] liaison to the council."

directed the DPW to place a pump near Kuhn's home, there was no guarantee that it would have rectified the problem.

Second, while we agree that *Kendricks* provides authority for Kuhn's claim that "sometimes the distinction between mere negligence and gross negligence is the element of time," we believe that the nature of the right affected is also relevant to the distinction between ordinary and gross negligence. The plaintiff in *Kendricks* was denied his physical freedom for seven months, thus implicating one of the most carefully guarded constitutional rights. See *Mead v Batchlor*, 435 Mich 480, 498; 460 NW2d 493 (1990) ("It is axiomatic that the liberty interest of every citizen—the right to personal, physical freedom—is of paramount importance under the constitution."), abrogated on other grounds by *Turner v Rogers*, 564 US 431; 131 S Ct 2507; 180 L Ed 2d 452 (2011). Without suggesting that the intrusion of water onto Kuhn's property was insignificant, it did not rise to the level of wrongful physical incarceration. Nor was the harm in this case a continuous matter like in *Kendricks*. The flooding came and went in correlation with the water levels in the river. Under these circumstances, Kuhn failed to establish a factual dispute that Thiel's passive conduct, prolonged as it was, rose to the level of gross negligence. *Bellinger*, 319 Mich App at 660. While we sympathize with Kuhn for the persistent flooding that she has experienced, the trial court did not err by concluding that Thiel was entitled to summary disposition.

We affirm.

/s/ Elizabeth L. Gleicher
/s/ Kristina Robinson Garrett
/s/ Allie Greenleaf Maldonado

-12-